## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| EDUCATIONAL CREDIT MANAGEMENT CORPORATION, ) ) ) | |
| Appellant, ) ) | |
| v. ) ) | Case No.  12-cv-1164 |
| SUSAN M. KRIEGER, ) ) | |
| Appellee. ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Appellant's appeal from the decision of the United States Bankruptcy Court for the Central District of Illinois discharging Appellee's student loan debt. Both parties have filed their respective briefs, and the matter is ready for disposition. For the reasons stated below, the decision of the bankruptcy court is reversed.

### STANDARD OF REVIEW

This Court has jurisdiction to review the decision of the bankruptcy court pursuant to 28 U.S.C. § 158(a). On an appeal, a "district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." FED. R. BANKR. P. 8013. District courts are to apply a dual standard of review when considering a bankruptcy appeal: the bankruptcy court's findings of fact are reviewed for clear error, while the conclusions of law are reviewed de novo. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004). "A finding is 'clearly erroneous' when

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The Court reviews mixed questions of fact and law de novo. *Mungo*, 355 F.3d at 974.

## BACKGROUND[1]

Appellee is 52 years old and is in good health. She graduated from high school in 1978, and soon married her first husband. After their divorce, she worked in clerical positions and as an inventory control clerk until 1986, when she left work to be a homemaker. In 1992, she began doing part-time bookkeeping work. In 1999, Appellee obtained an associate's degree in business and accounting, and in 2000, she enrolled at Webster University in pursuit of a paralegal degree. Appellee obtained her paralegal certificate in December 2000, and began seeking employment as a paralegal; she also worked as an intern with the federal district court before graduation. She completed her bachelor's degree in August 2002, earning a grade point average of 3.86. In addition to scholarships and grants, Appellee financed her education through five student loans.

Appellee and her second husband divorced in 2001, and he was awarded custody of their two high-school-age children. Appellee received a mutual fund account worth $52,000 and a savings account worth $10,000; she was entitled to $1200 in monthly maintenance for five years, from which she was obligated to pay

---

[1]   These background facts are drawn from the bankruptcy court's opinion, as neither party appears to seriously contest its finding of facts, and the Court therefore sees no "clear error" in it. (Bankruptcy Case Number 11-ap-8010: Doc. 33 (hereinafter referred to as "Op.") at 2-6).

$529.78 for her car, which was leased in her husband's name.[2] She was also liable for four percent of her two younger children's college expenses.[3] Appellee's former husband was awarded their marital home and continued to pay the mortgage, but Appellee stayed there until 2005, during which period she did not receive any maintenance and her former husband paid all household expenses.

Appellee later moved out of the marital home and rented an apartment. Appellee and her former husband also agreed to reduce her maintenance to $650 a month, from which Appellee was still responsible for the car payment. In December 2008, Appellee moved to her mother's home in Dallas City, Illinois, a rural community with a population of less than 1,000 people. Her mutual fund and savings accounts are now depleted, and she has no remaining savings or investments. Appellee is now dependent on her mother for support; her own income is limited to $200 in food assistance. Her mother is 74, and has a small farming income as well as social security. Appellee's son also gave her a credit card for emergency use.

---

[2] Appellee takes issue with the bankruptcy court's consideration of her divorce settlement, as the details of that settlement were sealed under Missouri law; she also appears to claim that the standard of living contemplated by the divorce settlement should be used by the bankruptcy court in considering her financial situation. This Court finds no error in the bankruptcy court's consideration of her divorce settlement, as her financial condition and assets are material, and because she "opened the door" to their consideration by filing for bankruptcy protection. Appellee's private agreement with her ex-husband does not alter her responsibility for her debt, and does not alter the legal standard to be applied when considering discharge of federal student loan debt.

[3] The bankruptcy court noted that Appellee was liable for college expenses "according to the same percentages as child support is calculated under Missouri law," which Appellant indicates is four percent in this case. (Op. at 3; Doc. 2 at 6).

Appellee's student loans first came due in November 2003, and she has obtained deferments and forbearances of the payments ever since. On March 19, 2001, she paid $4,000 toward them from her divorce settlement, paying off one of the loans. Later in 2001, she made a payment of $297, in 2002 she made a payment of $332, in 2003 she made a payment of $43, and in 2006 she made a payment of $600. As of March 25, 2011, the total amount due was $24,185.75. For four of the five loans, the interest rate is 2.82%, and the interest rate for the fifth is 5.39%.

Appellee testified that she applied for at least 180 job positions over the ten years since her graduation. However, in 2010 she only made around eight applications, and in 2011 she made only a few. Appellee testified that she feels she is now permanently unemployed, and holds out no hope of finding a job, though she would take a job if one were offered.

## DISCUSSION

Appellant challenges the bankruptcy court's decision to discharge Appellee's student loan debt. Unlike ordinary debts, federally-guaranteed student loans are presumptively non-dischargeable in bankruptcy. *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005) (citing 11 U.S.C. § 523(a)(8)) (abrogated on other grounds by *United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367, 1375 (2010)). This is so because, unlike most other forms of significant debt, they are given to borrowers regardless of credit rating, typically at low interest rates, and are not protected by any form of collateral. In return for this risky investment, lenders have the assurance that it is very difficult for a borrower to discharge the loan in bankruptcy after having obtained the education thereby purchased. *See Matter of Roberson*, 999

F.2d 1132, 1135-37 (7th Cir. 1993);[4] *In re Brunner*, 46 B.R. 752, 756 (D.C. N.Y. 1985) (affirmed by *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987). The bankruptcy code therefore provides that a federally-guaranteed student loan will not be discharged unless repayment "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).

The Seventh Circuit, like most Circuits, has adopted the test set forth by the Second Circuit in *Brunner*, to determine whether the repayment of a student loan will cause "undue hardship.[5] *Roberson*, 999 F.2d at 1135 (citing 831 F.2d at 396).

> "[U]ndue hardship" requir[es] a three-part showing (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* (quoting *Brunner*, 831 F.2d at 396) (alterations in original). The debtor bears the burden of proving that the loans should be discharged. *Goulet v. Educational Credit Management Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498

---

[4]   In *Roberson*, the Seventh Circuit quoted from the relevant legislative history:

> [E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely [ ] for repayment solely on the debtor's future increased income resulting from the education. In this sense, the loan is viewed as a mortgage on the debtor's future.

999 F.2d at 1135-36 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6094) (alterations in original).

[5]   In the bankruptcy court's order, it noted that the Tenth Circuit has "reinterpreted" Brunner, making it more lenient, and quoted extensively from that court's opinion. (Op. at 7-8 (quoting *Educational Credit Management Corp. v. Polleys*, 356 F.3d 1302, 1308 (10th Cir. 2004)). This "reinterpretation" of *Brunner* has not been endorsed by the Seventh Circuit, and so is not used by this Court.

U.S. 279, 291 (1991); *United States v. Wood*, 925 F.2d 1580, 1583 (7th Cir. 1991). "[W]hether [the debtor's] circumstances meet that test [is] a question of law subject to de novo review." *Goulet*, 284 F.3d at 777 (quoting *Roberson*, 999 F.2d at 1137).

Before the bankruptcy court, Appellant conceded that Appellee could not maintain a minimal standard of living if required to repay the loan, the first element of the *Brunner* test, so this Court cannot review the existence of that element on appeal.[6] The bankruptcy court found that Appellee had shown the existence of the other two prongs, as well, and Appellant now challenges that finding.

I. **Additional circumstances indicating that debtor will be unable to pay for a significant portion of the repayment period**

As noted above, Appellee graduated from Webster University in 2002, and has been unable to obtain a job since that time. The bankruptcy court found that Appellee had applied for more than 180 jobs in that period, that her job search had been "extensive," and that her paralegal skills had likely become too "stale" to be of use for future employment.[7] (Op. at 9). It therefore concluded that Appellee would

---

[6] The Court notes that some courts have considered the availability of income-based or income-contingent repayment plans in finding that repayment would not be too onerous, under the first prong, or that such financial difficulty would persist, under the second prong. *See, e.g.*, *In re Durrani*, 311 B.R. 496, 506 (Bkrtcy. N.D. Ill. 2004) (borrower could not afford even the income-contingent payments and so satisfied first prong); *Educational Credit Management Corp. v. Stanley*, 300 B.R. 813, 818 (N.D. Fla. 2003) (fact that borrower could afford income-contingent payments meant that she did not satisfy first prong); *In re Archibald*, 280 B.R. 222, 228 (Bkrtcy. S.D. Ind. 2002) (availability of income-contingent repayment meant that borrower could not prove second prong).

[7] In her Response, Appellee attempts to show that she applied for additional jobs, but it is not appropriate for this Court to expand the record on appeal beyond

continue to be unemployed for the foreseeable future such that she had met the requirements of the second prong of the *Brunner* test.

The Seventh Circuit has used the phrase "certainty of hopelessness" to describe the showing the debtor must make in order to meet the second *Brunner* prong. *Roberson*, 999 F.2d at 1136. This means showing more than just a current hardship or inability to pay, and requires the debtor to "precisely identify her problems and explain how her condition will impair her ability to work in the future." *In re Clark*, 341 B.R. 238, 252 (Bkrtcy. N.D. Ill. 2006) (citing *Tirch v. Pa. Higher Educ. Assistance Agency*, 409 F.3d 677, 681 (6th Cir. 2005)).

Both before the bankruptcy court and on appeal, Appellant raises two main arguments against the finding that Appellee met the second prong of the Brunner test: that she has not done enough to seek work since her graduation, preferring to live off of the remainder of her divorce settlement to taking a less-preferred job, and that she had no disability or other conditions actually preventing her from finding work. While accepting the bankruptcy court's factual findings, this Court does not agree that Appellee's situation shows "additional circumstances" that indicate she is likely to remain unemployed during the bulk of the repayment period.

First, in response to Appellant's argument that Appellee had failed to adequately consider jobs outside her chosen field, the bankruptcy court cited a mere three instances, all in 2003, in which Appellee had applied for "other" jobs: a legal

---

that relied upon by the bankruptcy court, and so this Court does not consider any additional evidence. (Doc. 5 at 13).

secretary position, a newspaper circulation clerk, and an administrative assistant.[8] (Op. at 9). Further, the bankruptcy court appeared to discount this argument entirely, saying it was "ironic that one who obtains a specialized degree would be criticized for attempting to make full use of her education by finding a job in the field in which she is most highly qualified and in which her earning potential is greatest." (Op. at 9). However, Seventh Circuit precedent is clear that a debtor unable to find a job in her chosen field must be willing to accept less-than-ideal jobs, rather than choosing simply to not work. *In re O'Hearn*, 339 F.3d 559, 566 (7th Cir. 2003) (citing, *inter alia*, *In re Brightful*, 267 F.3d 324, 329 (3d Cir. 2001); *Roberson*, 999 F.2d at 1137)) ("it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans"); *see also Roberson*, 999 F.2d at 1137 ("If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow."). The fact that Appellee has so rarely applied for jobs outside her preferred area casts significant doubt on the idea that her current unemployment is due to "additional circumstances" that will necessarily persist into the future, but instead shows that it is likely due to her unwillingness to consider other types of work.

---

[8] If it were reviewing the facts de novo, the Court would not categorize a legal secretary job as being outside or below Appellee's paralegal training, but as an entry-level position within the field. However, the categorization is not "clear error" and so is not reversed.

Moreover, as Appellant points out, there is simply no objective reason Appellee should be unable to find work. She is only 52 years old, has no disability,[9] and admitted before the bankruptcy court that she has effectively given up looking for work and would only apply for a job that she had been assured she would get. Even in a poor economy, people can and do find work every day, and the fact that Appellee no longer wishes to spend her time in the often-frustrating pursuit of a job does not mean that the taxpayers should be required to bear the cost of her educational debt. *See In re Sederlund*, 440 B.R. 168, 174 (8th Cir. BAP 2010) ("the current economic climate cannot be a basis for meeting the high standard for dischargeability because everyone is in this recession together"). The bankruptcy court pointed out that it applies a subjective, rather than objective analysis; the analysis focuses on what the debtor herself can do, not on what a hypothetical person in her position could do. However, this does not mean that Appellee's objective circumstances are irrelevant – it is still the case that she has identified no "additional circumstances" that show that her financial situation is unlikely to improve in the future. All that Appellee has proven so far is that she is *currently* unemployed and disinclined to seek employment outside her preferred field, and unable to make payments, not that she is obliged to remain in that situation.

---

[9] In her Response brief, Appellee attempts to undercut the bankruptcy court's factual finding that she is in good health by saying that her lack of health insurance coverage means that she does not know if she has a disabling condition. The Court rejects this attempt, as the nature of a condition so disabling that it prevents work is such that the sufferer would certainly know of its existence, even if she does not know the cause or diagnosis. Moreover, it certainly is insufficient to show that the bankruptcy court made a "clear error" in finding that Appellee is in good health.

The Seventh Circuit's opinion in *Goulet* supports the Court's conclusion that Appellee has not met the requirements of the second *Brunner* prong. 284 F.3d 773. In that case, the debtor was a 55 year old man with alcoholism and at least one felony conviction. The student loans at issue arose from a graduate degree he had pursued beginning at age 45, though he did not complete the degree; they amounted to approximately $76,000 and bore an interest rate of 9%. Goulet had obtained a few jobs since his graduation, but had been unable to hold one for any significant period of time, and was unemployed at the time of oral argument before the circuit court. He lived with his mother, who supported him on her social security income. *Id.* at 775-77. The Seventh Circuit held that the bankruptcy court had erred in the legal conclusion that his circumstances met the second element of the *Brunner* test. *Id.* at 778-79. Goulet's circumstances were quite similar to Appellee's: age at time of bankruptcy, age when student loans were obtained, past inability to hold or get a job, and reliance on family support.[10] Goulet, though, faced a number of additional

---

[10] In her Response, Appellee attempts to distinguish *Goulet* by pointing out a number of irrelevant differences. (Doc. 5 at 21-22). The irrelevance of two of these differences is pointed out in specific cases, including the difference between the level of education and the current economic downturn. *Brunner*, 46 B.R. at 755 n. 3 ("value" of education received not a factor); *Sederlund*, 440 B.R. at 174 ("the current economic climate cannot be a basis for meeting the high standard for dischargeability because everyone is in this recession together"). Likewise, variations between their forbearance and repayment histories are not relevant to the second prong, but are instead relevant to the "good faith" inquiry. The fact that Goulet managed to obtain a few jobs does not significantly distinguish him from Appellee, as the record in *Goulet* showed that he did not hold those jobs for more than a short period; a few low-paid very-short-term jobs does little more to improve one's financial situation than unemployment. Appellee also focuses on Goulet's work history following his college graduation in his 20s, but if the same lookback period is applied to her situation, the Court must observe that she held bookkeeping jobs during her younger years, as well. Similarly, the claimed distinction between ages upon attaining a bachelor's degree is spurious, as Goulet's student loans arose from

challenges, including a felony record, alcoholism, significant child support obligations, and a more severe student loan debt. In spite of these, the appellate court noted that there was no "evidence demonstrating that his problems are insurmountable, or that they impair his ability to work." *Id.* at 779. The court also observed that even if Goulet's "prospects in [his areas of experience and graduate training] are foreclosed, there is no evidence that Goulet is unemployable in other areas." *Id.* In *Goulet*, the circuit court looked to the objective facts about the debtor, which are quite similar to Appellee's, and found no reason to believe that he should not be able to get a job. In addition, Goulet did not put on any reason to believe that he would, subjectively, be any different from what those objective facts implied about him. Likewise, Appellee's objective circumstances show nothing extraordinary that indicate an inability to work, and she has shown nothing unique to herself that makes employment impossible.

Though the Court does not believe that Appellee has met the requirements of the second *Brunner* prong, it need not rely solely on this finding, as it is clear that the bankruptcy court misapplied the *Brunner* good faith analysis.

## II. Good faith

After finding that Appellee had met the second prong of the Brunner test, the bankruptcy court turned to the question of whether she had made a good faith effort to repay her loans. It noted that, though Appellee has been unemployed since her

---

graduate work in his 40s; indeed, he was older than Appellee when he took out those loans. The most relevant period is that after obtaining the loan-financed education. Finally, the fact that Appellee is a woman is irrelevant, as this fact, as well as her time away from work to stay home with her children, obviously pre-existed her decision to obtain her degree, but she "must have believed that [s]he had future earnings potential" before undertaking the debt. *Goulet*, 284 F.3d at 779.

11

graduation, and had very little income in that period, she did make some efforts to pay her loans. Indeed, she paid off one of her five student loans while still in school, using proceeds of her divorce settlement, though Appellant now points out that this was not one of the loans that it held. Given the fact that Appellee has had essentially no income to speak of during the repayment period, this Court agrees with the bankruptcy court that she has shown a good faith effort to repay her loans up through 2006. Since that time, however, Appellee has made no effort to repay her loans, nor to investigate any alternative repayment plan.

After noting Respondent's repayment history, the bankruptcy court turned to Appellant's argument regarding Appellant's failure to take advantage of an alternative repayment plan, such as the William D. Ford Income-Based Repayment ("IBR") program.[11] The bankruptcy court stated that it did not find the failure to consider IBR "dispositive" because she would "gain nothing" from a payment plan under which she paid nothing while the lender "agrees to defer payments, while continuing to accrue interest." (Op. at 13). In so holding, the bankruptcy court noted several cases noting that the availability of an alternative repayment plan is not dispositive on the question of good faith. *See In re Bronsdon*, 435 B.R. 791, 801-03 (1st Cir.BAP. 2010) (applying totality of circumstances test); *In re Crawley*, 460 B.R.

---

[11] The Court takes Appellant's reliance on the IBR plan as assurance that Appellee's loans would qualify for it, and that her loans could be consolidated such that she would make a single payment based on her income. If, when Appellee attempts to enroll in the plan following this Order, she finds that she is not eligible for it, or that her loans cannot be consolidated, she may return to the bankruptcy court for a modification of her loan's repayment terms to an amount she is able to pay, as it is obvious that Appellee does not, and likely will not, have the means to repay her loans on an ordinary 10-year repayment schedule, or even, once she begins to earn an income, to make four payments based on that income.

421, 444-46 (Bankr. E.D. Pa. 2011); *In re Benjumen*, 408 B.R. 9, 24 (Bankr. E.D. N.Y. 2009); *In re Durrani,* 311 B.R. 496, 505-09 (Bankr. N.D. Ill. 2004); *In re Grawey*, 00-83643, 01-8010, 2001 WL 34076376, 6 (Bankr. C.D. Ill. Oct. 11, 2001).[12] None of these cases, though, stand for the proposition that an unjustified failure to take advantage of an alternative repayment plan should be entirely discounted.

The bankruptcy court's lenient consideration of Respondent's failure to take advantage of the IBR program appears to be based on the idea that she would "gain nothing" from the program because her payments while unemployed would be $0, and that the program is a form of deferment, merely postponing payments to some later date. (Op. at 12-13). This is not the case. Under the IBR program, once enrolled, a debtor who is qualified to make $0 payments is still considered to be in repayment, and will have her debt burden completely forgiven after 25 years of qualifying "payments" – even if she has never actually paid anything because her earnings were never high enough to result in a positive payment under the plan.[13] 34 C.F.R. § 685.221(f). IBR undoubtedly offers something to an unemployed debtor: credit towards complete loan forgiveness. Unlike complete discharge of her debt in bankruptcy, though, the only option Respondent seems willing to consider, it does require that, if she does find gainful employment in the future, that she pay a

---

[12]   Most of these cases consider the older Income Contingent Repayment Plan, which differs somewhat from the Income Based Repayment Plan at issue here, though both base the borrower's payment on her income and both offer forgiveness of the loan after 25 years in the program.

[13]   In IBR, borrowers must pay 15% of their "discretionary income," which is their income in excess of 150% of the federal poverty guidelines. 34 C.F.R. § 685.221(b)(1). Under her current circumstances, Respondent would have to earn $20,000/year before she would be required to begin making $41/month payments.

manageable portion of her discretionary income toward her debt. *Vargas v. Educational Credit Management Corporation*, 10-4022, 2010 WL 5395142, *5 (C.D. Ill. Dec. 22, 2010) ("Even if no payment was required under the plan and the amount due would have essentially remained unchanged, signing up for one of the repayment alternatives would have demonstrated a continued acknowledgment of the debt and some intent to repay."). Respondent has simply offered no explanation for her failure to investigate repayment options such as IBR, and the bankruptcy court's misunderstanding of the program's terms undercuts the soundness of its decision to completely disregard this failure on her part.[14]

While not "dispositive," several courts, including courts in this District, have considered the failure of a debtor to utilize an available alternative payment

---

[14] Neither the parties nor the bankruptcy court mentioned this, but some courts have expressed concern about the fact that when the loan balance is forgiven, the forgiven debt may be considered taxable income. *See In re Jesperson*, 571 F.3d 775, 782 (8th Cir. 2009); *Educational Credit Management Corp. v. Rhodes*, 464 B.R. 918, 926 (W.D. Wash. 2012); *Bronsdon*, 435 B.R. at 802; *Benjumen*, 408 B.R. at 24; *Durrani*, 311 B.R. at 508; *Grawey*, 2001 WL 34076376, *6. However, as the Eighth Circuit pointed out in *Jesperson*, "cancellation results in taxable income only if the borrower has assets exceeding the amount of debt being cancelled" immediately before the discharge; for this to be the case, Appellee's financial situation would have to improve considerably, which she currently asserts, under the second prong of the *Brunner* analysis, will not occur. 571 F.3d at 782 (citing 26 U.S.C. § 108(a)(1)(B)); *see also Bronsdon*, 421 B.R. at 35. Moreover, contrary to what some courts seem to imply, the debtor would not then become liable for a tax in the amount of the discharge, but would only have the relevant marginal tax rate applied as for other income. *In re Archibald*, 280 B.R. 222, 229 (Bkrtcy. S.D. Ind. 2002). Finally, other bankruptcy courts have addressed the uncertainty of future tax laws by requiring participation in IBR or income-contingent repayment, but also prospectively discharging the debtor's remaining student loans after 25 years in the repayment program, in order to avoid any potential tax liability, because a discharge by a bankruptcy court is not a taxable event. *In re Ayele*, 468 B.R. 24, 35-36 (Bkrtcy. D.Mass. 2012); *see also In re Brunell*, 356 B.R. 567, 580-81 (Bkrtcy. D.Mass. 2006) (discharging future potential tax liability). If the bankruptcy court is concerned about the potential tax implications of IBR, it has the equitable authority to address that concern, without relieving Appellee of her responsibility altogether.

14

program to be a very significant factor in determining whether that debtor has made a good faith effort to repay her loans, stating that a debtor must "take advantage of one of the repayment plans available to [her] if and when [she] is able to do so." *Vargas*, 2010 WL 5395142, *5 (quoting *In re Larson*, 426 B.R. 782, 795 (Bkrtcy. N.D. Ill. 2010)); *see also Clark*, 341 B.R. at 255 (citing *In re Bard-Prinzing*, 311 B.R. 219, 229 (Bkrtcy. N.D. Ill. 2004)) ("to meet the good faith test, a debtor must take advantage of one of the repayment plans available to her if and when she is able to do so"); *In re Kehler*, 326 B.R. 142, 149 (Bkrtcy. N.D. Ind. 2005) (citing *In re Thoms*, 257 B.R. 144, 149–50 (Bkrtcy. S.D. N.Y. 2001)); *see also In re Crawley*, 460 B.R. 421, 444-45 nn. 29-33 (Bkrtcy. E.D. Pa. 2011) (collecting cases); *Bronsdon*, 421 B.R. 27, 36 (D. Mass. 2009) (collecting cases). This Court agrees with Judge Mihm's conclusion in *Vargas*, as well as these other courts, that a student loan debtor should take advantage of a feasible alternative repayment plan instead of seeking complete discharge of the responsibility, and that failure to do so is very strong evidence of bad faith. As part of determining that an alternative payment plan is not feasible, the bankruptcy court must, at a minimum, correctly explain why IBR or a similar program is a bad deal for *this particular borrower*, as did the courts in *Crawley*, *Bronsdon*, and *Larson*, not just dismiss it as "not dispositive." *Crawley*, 460 B.R. at 445-46; *Bronsdon*, 435 B.R. at 803 (district court had remanded to bankruptcy court for individualized analysis in 421 B.R. 27); *Larson*, 426 B.R. at 794. Here, there was no analysis tailored to Appellee's situation.

Moreover, a bankruptcy court should consider a debtor's attempts to "maximize income" as part of the good-faith analysis. *Roberson*, 999 F.2d at 1136.

Here, as noted above under the second prong, Plaintiff's attempts to get a job cannot be considered a "good faith" attempt to maximize her income because it is plain from the facts found by the bankruptcy court that she unreasonably limited her job search, and has, for all practical purposes, now given it up entirely.

Though Appellee's past payments were likely all that she could manage at that time, neither she nor the bankruptcy court have offered an explanation as to why, going forward, the IBR program is not a better alternative than a complete discharge of her student loans. Under that program, Appellee would not be liable for any payments on her loans until she could afford them; so long as she remains unemployed, though, she would have no payment, but would continue to receive credit toward forgiveness of the loans after 25 years. Absent a particularized explanation of why IBR is not a good fit for Appellee, the Court cannot find that her failure to enroll in it is compatible with a good faith effort to repay her loans over the long term. The fact that Appellee has also effectively given up looking for work also shows that she has failed to maximize her income as required to show good faith.

## CONCLUSION

The Court finds that that bankruptcy court's application of the *Brunner* test was erroneous, in that Appellee has shown neither "additional circumstances" indicating that she is likely to remain in financial distress into the future, nor that she has made a good faith effort to repay her loans during the latter half of the period since her graduation. Therefore, the judgment of the bankruptcy court discharging Appellee's student loans is REVERSED.

CASE TERMINATED.


Entered this <u>6th</u> day of November, 2012.


                                                s/ Joe B. McDade
                                                JOE BILLY McDADE
                                        United States Senior District Judge